UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA AND )
THE STATE OF ALASKA, )
)
                Plaintiffs, )
)
     vs. )
) <u>CONSENT DECREE</u>
)
ADAK PETROLEUM, )
LLC, ) Civil Action #
)
            Defendant. )

# TABLE OF CONTENTS

I.      RECITALS ................................................................................................. 1

II.     JURISDICTION AND VENUE ................................................................ 4

III.    EFFECT OF CONSENT DECREE ......................................................... 4

IV.     DEFINITIONS.......................................................................................... 4

V.      RESTORATION REQUIREMENTS AND TRUSTEE OVERSIGHT ........................... 7

        A.      Settling Defendant's Restoration Requirements:.................................... 7

        B.      Trustee Oversight of Restoration Work:................................................ 9

VI.     RESPONSIBILITY FOR COMPLIANCE....................................................... 11

VII.    PAYMENT OF TRUSTEE COSTS ............................................................. 11

        A.      Payment of Past Costs to Natural Resource Trustees: ......................... 11

        B.      Payment of Future Costs to Natural Resource Trustees: ..................... 12

VIII.   FORCE MAJEURE .................................................................................. 13

IX.     DISPUTE RESOLUTION .......................................................................... 15

X.      STIPULATED PENALTIES ....................................................................... 18

XI.     COVENANT NOT TO SUE BY PLAINTIFFS............................................... 20

        A.      Covenant by the United States:............................................................ 20

        B.      Covenant by State Trustees:................................................................. 21

XII.    COVENANT NOT TO SUE BY THE SETTLING DEFENDANT ............................. 21

XIII.   RESERVATION OF RIGHTS ..................................................................... 22

XIV.    COSTS ................................................................................................... 24

-i-

**TABLE OF CONTENTS**
(continued)

XV.     NOTICES......................................................................................................................... 24

XVI.    EFFECTIVE DATE.......................................................................................................... 25

XVII.   RETENTION OF JURISDICTION .................................................................................. 25

XVIII.  MODIFICATION .............................................................................................................. 25

XIX.    TERMINATION................................................................................................................. 25

XX.     PUBLIC PARTICIPATION .............................................................................................. 26

XXI.    SIGNATORIES/SERVICE................................................................................................ 26

XXII.   INTEGRATION ................................................................................................................ 27

XXIII.  APPENDIX........................................................................................................................ 27

XXIV.  FINAL JUDGMENT ........................................................................................................ 27

# I.     RECITALS

A.     This Consent Decree is made and entered into by and among the following parties (hereinafter referred to collectively as "the Parties" and individually as "Party"):

FOR THE PLAINTIFF:  The United States of America on behalf of:  the Department of Commerce (including the National Oceanic and Atmospheric Administration ("NOAA"); the Department of the Interior ("DOI") (including the U.S. Fish and Wildlife Service); the State of Alaska on behalf of the Alaska Department of Fish and Game (ADFG), the Alaska Department of Natural Resources (ADNR), the Alaska Department of Law (ADOL), and the Alaska Department of Environmental Conservation (ADEC).  Collectively these government agencies are referred to as the "Trustees" or the "Natural Resource Trustees."

FOR THE DEFENDANT:  Adak Petroleum, LLC, as the Settling Defendant, acknowledges and stipulates, for the sole purpose of giving effect to this Consent Decree and to satisfy the requirements of §1017(f)(1) of the Oil Pollution Act of 1990 (OPA), 33 USC § 2717(f)(1), that it is the Responsible Party (RP) for the 2010 Adak oil spill Incident.

B.     Natural Resource Trustees are authorized to act on behalf of the public to assess and recover natural resource damages, to plan and implement restoration actions and to restore natural resources injured and lost as a result of oil spills.  DOI and NOAA are designated federal Natural Resource Trustees pursuant to subpart G of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") (40 C.F.R. §§ 300.600, *et seq*.) and Executive Order 12580 (52 Fed. Reg. 2923 (January 23, 1987) as amended by Executive Order 12777 (56 Fed. Reg. 54757 (October 19, 1991).  ADFG, ADNR, ADOL and ADEC are Natural Resource Trustees pursuant to subpart G of the NCP (40 C.F.R.  300.600, *et seq*).  Each of the agencies acts as a Natural Resource Trustee pursuant to OPA, 33 U.S.C. 2706 *et. seq*.

C.    The Trustees have alleged the following: On January 11, 2010, up to 142,000 gallons of #2 diesel fuel was released from a 4.8 million gallon underground tank at the Adak Petroleum Bulk Fuel facility on Adak Island in the central Aleutian Islands of Alaska (hereinafter referred to as "the Incident"). Fuel was being transferred from a tanker at the adjacent loading dock when the tank was overfilled. The containment sump unit was overwhelmed and the fuel entered Helmet Creek, which flows into the small boat harbor in the Port of Adak. Approximately 2 km of Helmet Creek and 2.5 acres of associated riparian habitat experienced direct impacts. Most of the diesel was confined to the creek, though possibly more than a thousand gallons flowed out to Sweeper Cove affecting approximately 9.2 acres of marine habitat and shoreline in the small boat harbor and outer harbor. Hereinafter, both the Creek and the area in Sweeper Cove are referred to generally, but not exclusively, as the "Incident Site". Oil from the Incident caused injuries to natural resources, including birds, fish, and their habitats, and also had an impact upon recreational uses of natural resources and other public resources.

D.    After the Incident, the Trustees for Natural Resources injured by the spill and the Settling Defendant entered into a cooperative natural resource damage assessment (NRDA) process. Injury assessment activities were planned and conducted, including gathering and analyzing data and other information. The Trustees subsequently used the data and other information to determine and quantify the resource injuries and damages. Because Adak Petroleum has agreed to undertake restoration at the Incident Site, the Trustees developed a Damage Assessment and Restoration Plan/Environmental Assessment (DARP/EA), which describes the affected environment and illustrates potential restoration alternatives and their environmental consequences. The DARP/EA was made available for public comment in March 2013 and thereafter was finalized after response to comments. The Trustees also worked with

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 5 of 52

Adak Petroleum to develop the Helmet Creek Restoration and Monitoring Work Plan (hereinafter referred to as "the Work Plan"), which outlines specific steps to be taken to restore natural resources injured by the oil spill and recover natural resource services lost as result of the Incident. The Work Plan was finalized after the public comment period.

E.       Under the terms of this Consent Decree, and effective upon settling, the Settling Defendant has agreed to undertake full performance of work in accordance with the requirements of the Work Plan, as well as related documents created pursuant to the Work Plan. The Work Plan is incorporated at Appendix A, and its requirements are made enforceable under this Consent Decree. Hereinafter, all obligations of the Settling Defendant pursuant to the Helmet Creek Restoration and Monitoring Work Plan are collectively referred to as "Restoration Work."

F.       Plaintiffs have filed a Complaint in this action alleging that the Settling Defendant is liable under Section 1002(b) of OPA, 33 U.S.C. § 2702(b), for damages for injury to, destruction of, and loss of natural resources and their services resulting from the release of oil, including the costs of assessing the damages. The Settling Defendant denies the allegations in the Complaint and does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint and the matters alleged in this Consent Decree. Neither this Consent Decree nor its terms shall constitute an admission to or evidence of liability in any violation by Adak Petroleum, LLC, and may not be used as evidence of liability or violation of the law in any proceeding involving Adak Petroleum, LLC, except in action to enforce this Consent Decree.

G.       The Parties agree, and the Court finds, that settlement of this matter without further litigation is fair, reasonable and in the public interest.

NOW THEREFORE, with the Consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## II.        JURISDICTION AND VENUE

1.        This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, 28 U.S.C. §§ 1331, 1345, 1355 & 1367; OPA, 33 U.S.C. § 2717(b).  Venue is proper in this Court pursuant to, *inter alia,* 28 U.S.C. §§ 1391(b), (c) and 1395(a), 33 U.S.C. § 2717(b), because Settling Defendant did business in, and the January 2010 oil spill Incident occurred in, this Judicial District.  The Court has personal jurisdiction over Settling Defendant for this particular action, and each Party does not contest the Court's jurisdiction and does not contest the propriety of venue in this Judicial District for the purposes of this Consent Decree.

## III.        EFFECT OF CONSENT DECREE

2.        This Consent Decree shall apply to, be binding upon, and inure to the benefit of the United States, the State Trustees, and the Settling Defendant and its successors and assigns.  Any change of ownership or corporate status of the Settling Defendant including, but not limited to, any transfer of assets, real or personal property shall in no way alter the Settling Defendant's responsibilities under this Consent Decree.

## IV.        DEFINITIONS

3.        Terms used in this Consent Decree that are defined in OPA, or in regulations promulgated pursuant to OPA, shall have the meanings assigned to them in OPA or in such regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

(a)        "Consent Decree" shall mean the content of this Decree, including all Appendices.

(b)        "Costs" shall mean Future Costs and Past Costs.

4

(c) "Entry of the Consent Decree" or "Entry" shall be the date upon which this Consent Decree is entered by the Court or motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

(d) "Federal Trustees" shall mean the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration and the United States Department of the Interior, acting through the United States Fish and Wildlife Service.

(e) "Future Costs" shall mean Trustee Costs incurred after August 31, 2012.

(f) "Incident" shall mean the January 11, 2010 discharge of diesel fuel at the Adak Petroleum Bulk Fuel facility on Adak Island in the central Aleutian Islands of Alaska, including, but not limited to, the discharge of oil into navigable waters and onto adjoining shorelines. The Trustees have alleged that up to 142,000 gallons of #2 diesel fuel were released during the Incident.

(g) "Incident Site" shall mean the vicinity of the Adak diesel fuel spill, which includes, but is not limited to, the affected areas of Helmet Creek and Sweeper Cove, as well as associated marine and riparian habitat and shorelines.

(h) "Interest" shall mean the interest rate prescribed under OPA, 33 U.S.C. § 2705(b)(4), and shall be computed daily to the date of payment and compounded annually.

(i) "Natural Resource Damages" shall mean damages as defined in Sections 1001(5) and 1002(b)(2) of OPA, 33 U.S.C. §§ 2701(5) and 2702(b)(2), 15 C.F.R. § 990.30, as well as AS 46.03.760(d)(2), AS 46.03.780 and AS 46.03.822.

(j)     "Natural Resource Trustees" or "Trustees" shall mean those federal and state agencies or officials designated or authorized pursuant to the OPA and applicable state law to act as Trustees for the natural resources belonging to, managed by, controlled by, or appertaining to the United States or the State of Alaska.  Specifically, as used in this Consent Decree, the Trustees are DOI, NOAA, ADFG, ADNR, ADOL and ADEC.

(k)     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

(l)     "Parties" shall mean the United States, the State Trustees, and the Settling Defendant.

(m)     "Past Costs" shall mean Trustee Costs incurred through August 31, 2012.

(n)     "Plaintiffs" shall mean the United States and State of Alaska.

(o)     "Responsible Party" shall mean Adak Petroleum, LLC.

(p)     "Restoration Work" shall mean those restoration, construction, reporting and monitoring activities specified in the Helmet Creek Restoration and Monitoring Work Plan, which is incorporated at Appendix A and made enforceable under this Consent Decree.  Restoration Work shall also mean any additional work required under Section V, para.14 (*Restoration Requirements and Trustee Oversight*).

(q)     "State Trustees" shall mean the Alaska Department of Fish and Game (ADFG), Alaska Department of Natural Resources (ADNR), Alaska Department of Law (ADOL), and the Alaska Department of Environmental Conservation (ADEC).

(r)     "Settling Defendant" shall mean Adak Petroleum, LLC.

(s)     "United States" shall mean the United States of America, including its departments, agencies, and instrumentalities and includes the United States Department

6

of Commerce, acting through the National Oceanic and Atmospheric Administration, and the United States Department of the Interior, acting through the Fish and Wildlife Service.

## V.        RESTORATION REQUIREMENTS AND TRUSTEE OVERSIGHT

A.        **Settling Defendant's Restoration Requirements:**

4.        The Settling Defendant shall fund, perform, and execute the Restoration Work described in Appendix A (all provisions of which are incorporated and enforceable under this Consent Decree). Such work includes removing trash racks from Helmet Creek, clearing floodplain debris, restoring the creek grade to allow for fish passage, and re-vegetating the creek banks to provide stability. All required timelines for restoration, outlined in Appendix A, shall be met, unless the Parties agree, in writing, to an alternate timeframe. The Settling Defendant shall allow for Trustee monitoring and oversight of all Restoration Work required under this Consent Decree.

5.        Not later than thirty (30) days after the Entry of this Consent Decree, the Settling Defendant shall notify the Trustees, in writing, of the name, address, and telephone number of its designated Project Coordinator. The person so designated shall have technical expertise sufficient to adequately manage and supervise all aspects of the Restoration Work outlined in Appendix A. The Settling Defendant may change its Project Coordinator by providing written notice to the Trustees at least thirty (30) days prior to the change.

6.        The Settling Defendant shall implement the Restoration Work as described, defined and scheduled in Appendix A of this Consent Decree. The Settling Defendant shall comply with all applicable federal, state and local laws and regulations when implementing the Restoration Work. All federal, state, and local permits, rights-of-way, and other documents

7

necessary to implement the Restoration Work shall be obtained by the Settling Defendant at its expense.

7.     After the Restoration Work has been implemented, the Trustee Council, defined in paragraph 10 below, or its designees shall complete a compliance inspection survey as set forth in Appendix A. The compliance inspection survey shall assess whether all proposed actions and restoration goals have been correctly and fully implemented and that any changes made in the field are consistent with performance standards outlined in the Work Plan. The Trustee Council or its designees will communicate deficiencies in the Restoration Work to the Project Coordinator in the field, when possible, so that corrective actions may be implemented immediately.

8.     No later than sixty (60) days after completing the implementation of the Restoration Work as outlined in Appendix A, the Settling Defendant shall provide the Trustee Council with a written compliance inspection report. Such report shall be signed by the Settling Defendant's designated Project Coordinator and shall include information sufficient to show that all activities necessary to implement the Restoration Work have been completed in accordance with the terms outlined in Appendix A of this Consent Decree. The Trustee Council or its designees shall reserve the right to further inspect the Restoration Work after receipt of the compliance inspection report.

9.     After the Trustee Council approves the compliance inspection report, the Settling Defendant shall initiate project monitoring at the frequencies laid out in Appendix A of this Consent Decree. Monitoring reports shall be submitted to the Trustee Council for review and approval.

**B.    Trustee Oversight of Restoration Work:**

10.    Collectively, the Trustees shall act by consensus through the Adak Trustee Council, consisting of one representative designated by NOAA, DOI, ADFG, ADNR, ADOL and ADEC.

11.    The Adak Trustee Council shall address all matters relating to the Restoration Work required under this Consent Decree, including, but not limited to:

(a)    Overseeing the Restoration Work outlined at Appendix A of this Consent Decree, including implementation, monitoring and related activities undertaken by the Settling Defendant;

(b)    Identifying and determining appropriate additional or corrective actions to ensure that the performance standards associated with the required Restoration Work are met;

(c)    Approving the compliance inspection report, prior to the commencement of restoration monitoring requirements; and

(d)    Performing duties associated with the dispute resolution process, where necessary, as described in this Consent Decree.

12.    Trustee oversight of the Settling Defendant's Restoration Work shall be undertaken by the Adak Diesel Spill Restoration Committee (AdakRC), which will be composed of technical representatives from all Trustees. The AdakRC shall report to the Adak Trustee Council.

13.    If, based on the compliance inspection survey, monitoring, reporting, and upon consideration of other relevant information, the Trustee Council determines that the Restoration Work meets the performance standards outlined in Appendix A of this Consent Decree, the Trustee Council shall issue to the Settling Defendant a dated "Project Completion Certificate"

certifying that the Restoration Work is complete. Upon issuance of the Project Completion Certificate, the parties shall initiate actions to terminate the Consent Decree in accordance with Section XIX.

14.    If the Trustee Council determines that the Restoration Work has not been implemented in accordance with the requirements outlined in Appendix A of this Consent Decree or if any aspect of the Restoration Work fails to achieve the goal or performance standard for that task, the Trustee Council shall determine what additional activities or corrective actions are needed and shall provide to the Settling Defendant written notice of the additional work that must be undertaken. After receipt of this notice, the Settling Defendant shall submit, within sixty (60) days, a draft work plan for approval by the Trustee Council to complete the additional work, with the schedule for implementation. Upon approval of the draft work plan by the Trustee Council, the Settling Defendant shall implement the additional restoration work, according to the submitted schedule. Settling Defendant shall notify Trustee Council of completion of its additional work, and the Trustees shall evaluate whether the additional work has been implemented in accordance with Appendix A. If the Trustees determine that the additional work is complete, then the Trustee Council shall approve as set forth in Paragraph 13. Nothing in this Consent Decree shall prohibit modifications or additions to the Restoration Work based upon mutual agreement of the Parties.

15.    The Trustees, individually or collectively, may take any legal, administrative, or enforcement actions appropriate to enforce the terms of this Consent Decree. The Trustees and their designated representatives shall be given access at all reasonable times to the locations being used by the Settling Defendant to implement the Restoration Work, as well as all non-

10

privileged documents relating to the Restoration Work, for the purpose of overseeing and/or monitoring the implementation of the Restoration Work.

## VI.     RESPONSIBILITY FOR COMPLIANCE

16.     The Settling Defendant is and shall remain solely responsible for compliance with all terms of this Consent Decree, including meeting all requirements of the Restoration Work.

17.     This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any Federal or State statute or regulation. Likewise, nothing in this Consent Decree shall be construed to affect or limit the obligation of the Settling Defendant to comply with all applicable federal, state, and local laws and regulations governing any activity required by this Consent Decree.

## VII.     PAYMENT OF TRUSTEE COSTS

**A.     Payment of Past Costs to Natural Resource Trustees:**

Within twenty (20) days after the Effective Date, the Settling Defendant shall pay a total of $277,027.08 to the Plaintiffs, to reimburse Past Costs, as follows:

18.     ***Past Costs Incurred by NOAA and DOI:*** Settling Defendant shall pay a total of $272,875.91 to the United States for Past Costs incurred by NOAA and DOI. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures, referencing DOJ Case Number 90-5-1-1-10506. Payment shall be made in accordance with instructions provided to the Settling Defendant by the Financial Litigation Unit of the United States Attorney's Office for the District of Alaska. Any payments received by the Department of Justice after 4:00 p.m. (Eastern Time) will be credited on the next business day.

(a)     Of the total amount to be paid by Settling Defendant pursuant to this Subparagraph, $8,164.32 shall be applied toward Past Costs incurred by DOI.

11

(b)     Of the total amount to be paid by Settling Defendant pursuant to this

Subparagraph, $264,711.59 shall be applied toward Past Costs incurred by NOAA.

19.     **_Payment for Assessment Costs Incurred by Alaska:_**  Settling Defendant shall pay

a total of $4,151.17 to the State of Alaska for Past Costs incurred by the State. Payment shall be

made as set forth below.

(a)     Of the total amount to be paid by Settling Defendant pursuant to this

Subparagraph, $524.52 shall be applied toward Past Costs incurred by ADOL.  Payment

will be made payable to the State of Alaska and shall be mailed to Kamie Willis, Alaska

Department of Law, 1031 W. 4th Avenue, Suite 200, Anchorage, AK 99501.

(b)     Of the total amount to be paid by Settling Defendant pursuant to this

Subparagraph, $3,626.65 shall be applied toward Past Costs incurred by ADFG.

Payment will be made payable to the State of Alaska and shall be mailed to Alaska

Department of Fish and Game, Accounts Receivable Unit, PO Box 115526, Juneau, AK

99811-5526.

20.     For any portion of the Settling Defendant's payment that is made later than

twenty (20) days after the Effective Date of this Consent Decree, Interest on the unpaid balance

shall be paid at the rate established by OPA, 33 U.S.C. § 2705(b)(4), commencing on the twenty-

first (21st) day after the Effective Date of this Consent Decree.

**B.     Payment of Future Costs to Natural Resource Trustees:**

21.     The Settling Defendant shall be responsible for the payment of all Future Costs of

the Federal and State Trustees incurred after August 31, 2012.

22.     At least once annually, the State and Federal Trustees will each individually

submit to the Settling Defendant a bill for Future Costs with a cost summary with supporting

12

documentation. The Settling Defendant shall pay the Future Costs within thirty (30) days of receipt of each bill and cost summary. These costs shall be paid in the same manner as described in Part VII(A) above. In the event that payments required by this Paragraph are not made within thirty (30) days, Interest on the unpaid balance shall be paid commencing on the thirty-first (31st) day after the Settling Defendant's receipt of such bill and cost summary, and shall accrue through the date of payment. Disputes concerning the sufficiency of the supporting cost documentation provided by a State or Federal Trustee shall not defer payment obligations. Failure by the Trustees to timely submit Future Cost documentation shall not affect the Trustees' right to recover Future Costs.

23. Upon issuance of the Project Completion Certificate, the State and Federal Trustees shall promptly submit to the Settling Defendant a final bill for Future Costs.

## VIII. FORCE MAJEURE

24. "Force majeure" for the purposes of this Consent Decree, is defined as any event arising from causes beyond the control of the Settling Defendant, of the Settling Defendant's contractors, or of any entity controlled by the Settling Defendant or controlling the Settling Defendant, that delays or prevents the performance of any obligation under this Consent Decree, despite the Settling Defendant's best efforts to fulfill the obligation. The requirement that the Settling Defendant exercise "best efforts to fulfill the obligation" includes using the best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (1) as it is occurring, and (2) following the potential force majeure, such that the delay is minimized to the greatest extent possible. "Force majeure" does not include financial inability to (a) make payments of Past Costs or Future Costs, or (b) implement the Restoration Work or otherwise satisfy the requirements of Appendix A.

25.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure, the Settling Defendant shall orally notify the Trustees within forty-eight (48) hours of the time that the Settling Defendant first knew that the event might cause a delay. Within five (5) days thereafter, the Settling Defendant shall provide in writing to the Trustees a detailed description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay or the effect thereof; a schedule for implementation of any measures to be taken to prevent or mitigate the delay; the Settling Defendant's rationale for attributing such a delay to a force majeure if they intend to assert such a claim; and state whether, in the opinion of the Settling Defendant, such circumstances may cause or contribute to an endangerment to public health or the environment. The Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude the Settling Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. The Settling Defendant shall be deemed to know of any circumstance that was known by, or should have been known by, the Settling Defendant, the Settling Defendant's contractors, or any entity controlled by the Settling Defendant or controlling the Settling Defendant.

26.     If the Trustees agree that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by the Trustees for such time as necessary to complete the obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, by itself, extend the time for performance of any other obligation. If the

14

Trustees do not agree that the delay or anticipated delay has been or will be caused by a force majeure, the Trustees will notify the Settling Defendant in writing of their decision. If the Trustees agree that the delay is attributable to a force majeure, the Trustees will notify the Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

27. If the Settling Defendant elects to invoke the dispute resolution procedures set forth in Section IX (*Dispute Resolution*), they shall do so no later than fifteen (15) days after receipt of the Trustees' notice. In any such proceeding, the Settling Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that the Settling Defendant complied with the requirements of Paragraphs 25 and 26 above. If the Settling Defendant carries this burden, the delay at issue shall not be deemed to be a violation by the Settling Defendant of the affected obligation of this Consent Decree identified to the Trustees and the Court.

## IX. DISPUTE RESOLUTION

28. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedure of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. However, the procedures set forth in this Section shall not apply to actions by the United States or the State to enforce obligations of the Settling Defendant that have not been disputed in accordance with this Section.

29. *Informal Dispute Resolution:* If, in the opinion of either the Trustees or the Settling Defendant, there is a dispute that arises under or with respect to this Consent Decree, that Party shall send written notice to the other Parties to the dispute outlining the nature of the

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 18 of 52

dispute and requesting negotiations to resolve the dispute. The Parties shall endeavor to resolve the dispute through good faith negotiations. The period for informal negotiations shall not exceed thirty (30) days from the date the notice is sent, unless this time period is modified by written agreement of the Parties.

30. ***Formal Dispute Resolution***:

(a)    In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by the Plaintiffs, individually or jointly, shall be considered binding unless, within thirty (30) days after the conclusion of the informal negotiation period, the Settling Defendant invokes the formal dispute resolution procedures of this Section by serving the Plaintiff(s) with a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by the Settling Defendant.

(b)    Within sixty (60) days after receipt of Settling Defendant's Statement of Position, the Plaintiff(s) will serve on the Settling Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by the Plaintiff(s). Within fifteen (15) days after receipt of this Statement of Position, Settling Defendant may submit a Reply.

(c)    An administrative record of the dispute shall be maintained by the Plaintiff(s) and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, the Plaintiff(s) may allow submission of supplemental statements of position by the Parties to the dispute.

(d)     The Plaintiff(s) will issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 30(c). This decision shall be binding on the Settling Defendant, subject only to the right to seek judicial review pursuant to Paragraph 30(e).

(e)     Any administrative decision made by the Plaintiff(s) pursuant to this paragraph shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by the Settling Defendant with the Court and served on all Parties within ten (10) days of receipt of the Plaintiff(s)' decision. The motion shall include a description of the matter in dispute, the efforts made by the Parties to resolve it, the final administrative decision of the Plaintiff(s), the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The Plaintiffs may file a response to the Settling Defendant's motion.

(f)     In proceedings on any dispute governed by this Paragraph, Settling Defendant shall have the burden of demonstrating that the decision of the Plaintiffs is arbitrary and capricious or otherwise not in accordance with law. Judicial review of the decision of the Plaintiff(s) shall be on the administrative record compiled pursuant to Paragraph 30(c).

(g)     The invocation of informal or formal dispute resolution procedures pursuant to this Section shall not extend, postpone or affect in any way any obligation of the Settling Defendant under this Consent Decree that is not directly in dispute, unless the Trustees or the Court agree otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that the

17

Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (*Stipulated Penalties*).

## X. STIPULATED PENALTIES

31. The Settling Defendant shall be liable for stipulated penalties to the United States and the State for the Settling Defendant's failure to comply with the requirements of this Consent Decree specified below, unless excused under Section VIII (*Force Majeure*). "Compliance" by the Settling Defendant shall include the timely completion of the payments and activities identified in Sections V, VI, and VII within the time schedules established by and approved pursuant to the requirements of the Consent Decree, including Appendix A, and any work plans or other documents approved by the Trustees pursuant to this Consent Decree.

32. The following stipulated penalties shall accrue per violation per day for the Settling Defendant's failure to comply with the time schedules established for the following implementation requirements:

(a) Failure to comply with schedules in the Work Plan set forth in Appendix A:

| Penalty per Violation per Day | Period of Noncompliance |
| --- | --- |
| $ 500 | 1st through 7th day |
| $1,000 | 8th through 30th day |
| $1,500 | 31st day and beyond |

(b) Failure to make the payments of Past Costs or Future Costs in a timely manner:

| Penalty per Violation per Day | Period of Noncompliance |
| --- | --- |
| $ 500 | 1st through 7th day |
| $1,000 | 8th through 30th day |
| $1,500 | 31st day and beyond |

18

33.     All penalties shall begin to accrue on the day after performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

34.     Following the determination by the Plaintiffs, individually or jointly, that the Settling Defendant has failed to comply with one of the requirements of this Consent Decree listed above, the Plaintiff(s) may give the Settling Defendant written notification of the same and describe the noncompliance.  The Plaintiff(s) may send the Settling Defendant a written demand for the payment of penalties.  Penalties shall accrue and are due as provided in this Section regardless of whether the Plaintiff(s) have notified the Settling Defendant of a violation.  Notwithstanding any other provision of this Section, the United States and the State, in their unreviewable discretion, may waive any portion of stipulated penalties owed to them that have accrued pursuant to this Consent Decree.

35.     Stipulated penalties shall be paid as follows: Fifty percent (50%) of any stipulated penalty payments shall be paid to the United States in accordance with payment instructions provided by the Financial Litigation Unit of the United States Attorney's Office for the District of Alaska, and shall be deposited in the United States Treasury.  Fifty percent (50%) of any stipulated penalty payments shall be paid to Alaska, in accordance with the instructions set forth in Paragraph 19(a).

36.     In the event the Settling Defendant fails to pay stipulated penalties when due, the United States and/or the State may institute a legal proceeding to collect such penalties, as well as Interest accruing on any unpaid balance, as provided by law.

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 22 of 52

37.     All penalties due under this Section shall be due and payable within thirty (30) days of the Settling Defendant's receipt of a demand for payment from the Plaintiff(s), unless the Settling Defendant invokes dispute resolution under Section IX of this Consent Decree. In that case, stipulated penalties shall continue to accrue as provided in this Section, but need not be paid until the following:

(a)     If the dispute is resolved by agreement, accrued penalties agreed to be owed shall be paid to the United States and the State within thirty (30) days of the agreement;

(b)     If the dispute is appealed to this Court and the Plaintiff(s) prevail in whole or in part, the Settling Defendant shall pay all accrued penalties determined by the Court to be owed to the United States and the State within thirty (30) days of receipt of the Court's decision or order.

38.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of the Settling Defendant's violation of this Consent Decree.

## XI.     COVENANT NOT TO SUE BY PLAINTIFFS

**A.     Covenant by the United States:**

39.     Except as specifically provided in Section XIII (*Reservation of Rights*), the United States covenants not to sue the Settling Defendant pursuant to Section 1002(b)(1) or 1002(b)(2) of OPA, 33 U.S.C. §§ 2702(b)(1) or 2702(b)(2), or pursuant to Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), to recover Natural Resource Damages resulting from the Incident. This covenant not to sue shall take effect upon receipt of the Settling Defendant's payments pursuant to Section VII (*Payment of Trustee Costs*) of this Consent Decree. This covenant not to sue is conditioned upon the satisfactory performance by the Settling Defendant

20

of its obligations under this Consent Decree, including the payment of Future Costs, the successful performance by the Settling Defendant of its obligations to complete the Restoration Work, payment of all amounts that may become due to the United States under Section X (*Stipulated Penalties*), and to pay any Interest owed to the United States due to failure to timely pay any amount owed to the United States or the Federal Trustees. This covenant not to sue extends only to the Settling Defendant and does not extend to any other person.

**B.      Covenant by State Trustees:**

40.      Except as specifically provided in Section XIII (*Reservation of Rights*), the State Trustees covenant not to sue the Settling Defendant pursuant to Section 1002(b)(1) or 1002(b)(2) of OPA, 33 U.S.C. §§ 2702(b)(1) or 2702(b)(2), or pursuant to Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), as well as AS 46.03.760(d)(2), AS 46.03.780, and AS 46.03.822, to recover Natural Resource Damages resulting from the Incident. This covenant not to sue shall take effect upon receipt of the Settling Defendant's payments pursuant to Section VII (*Payment of Trustee Costs*) of this Consent Decree. This covenant not to sue is conditioned upon the satisfactory performance by the Settling Defendant of its obligations under this Consent Decree, including the payment of Future Costs, the successful performance by the Settling Defendant of its obligations to complete the Restoration Work, payment of all amounts that may become due to the State under Section X (*Stipulated Penalties*), and to pay any Interest owed to the State due to failure to timely pay any amount owed to the State or the State Trustees. This covenant not to sue extends only to the Settling Defendant and does not extend to any other person.

## XII.      COVENANT NOT TO SUE BY THE SETTLING DEFENDANT

41.      The Settling Defendant hereby covenants not to sue and agrees not to assert any claims or causes of action of any nature against the United States or the State (including all employees, agents, contractors, departments, agencies, administrations of any of them) under

federal, state, or local law arising out of or relating to Natural Resource Damages resulting from the Incident. The Settling Defendant likewise expressly waives its right to file a claim pursuant to Sections 1008 and 1013 of OPA, 33 U.S.C. §§ 2708 and 2713, to recover sums claimed to have been paid or that may be paid by Settling Defendant arising from or connected with the Incident. Likewise, the Settling Defendant waives any claims arising out of the Restoration Work, including and without limitation, claims based on the Trustees' approval, oversight and monitoring of the Restoration Work. The Settling Defendant reserves all defenses as to substantive claims pursued after the Entry of this Consent Decree.

## XIII. RESERVATION OF RIGHTS

42. **General Reservation of Rights:** The United States and State Trustees reserve all rights against the Settling Defendant with respect to all matters not included in Section XI (*Covenant Not to Sue by Plaintiffs*), including the right to seek the costs required to enforce this Consent Decree, as outlined in Section XIV, (*Costs*).

43. The Trustees reserve all rights against the Settling Defendant with respect to claims or causes of action based on the Settling Defendant's failure to satisfy any requirement of this Consent Decree and based on non-Natural Resource Damage-related claims or causes of action. This reservation includes, but is not limited to, actions taken by the Trustees, individually or collectively, to institute proceedings against the Settling Defendant seeking recovery for:

> (a) claims or causes of action for Natural Resource Damages, based upon conditions caused by the Incident that were unknown to the Trustees at the time this Consent Decree was lodged; or information received by the Trustees indicating that the Incident resulted in injury to, loss of, or loss of use of natural resources of a type or future persistence that was unknown to the Trustees at the time this Consent Decree was lodged;

22

or any additional work that may be required under Section V, paragraph 14 *(Restoration Requirements and Trustee Oversight)*;

(b)     claims or causes of action for injunctive relief or any other costs incurred by the Trustees that are not within the definition of Natural Resource Damages, including, but not limited to, claims for lost public services, removal and cleanup costs associated with the Incident as per OPA, 33 U.S.C. §§ 2702(b)(1) and (b)(2)(F) and/or the CWA, 33 U.S.C. §§ 1311 and 1321;

(c)     claims or causes of action brought against the Settling Defendant by the United States or the State of Alaska for future response costs associated with the Incident;

(d)     with the exception of claims or causes of action for recovery of Natural Resource Damages, claims or causes of action brought against the Settling Defendant by the United States or the State of Alaska, for civil assessments, penalties or other damages under federal or state law, including but not limited to AS 46.03.758, AS 46.03.760(a), or (d)(1) or AS 46.03.822, associated with the Incident;

(e)     claims or causes of action brought against the Settling Defendant by the United States or the State of Alaska for: (1) any criminal liability, (2) violation of any applicable federal or state law or regulation by the Settling Defendant for the Incident, or (3) violation of any applicable federal or state law or regulation by Settling Defendant when undertaking Restoration Work required by this Consent Decree; or

(f)     subrogated claims under Section 1015 of OPA, 33 U.S.C. § 2715, for any amount paid or to be paid by the Oil Spill Liability Trust Fund established pursuant to 26 U.S.C §§ 4611 and 9509.

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 26 of 52

## XIV. COSTS

44. The Trustees, individually or collectively, may take any legal, administrative, or enforcement actions appropriate to enforce the terms of this Consent Decree. The Trustees shall be entitled to collect from Settling Defendant the costs (including reasonable attorneys' fees) incurred in any action required to collect funding required for the Restoration Work contemplated under this Consent Decree, as well as any unpaid balance, including Interest.

## XV. NOTICES

45. Unless otherwise specified herein, whenever modifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, DC 20044-7611
Re: DOJ Number 90-5-1-1-10506

To the State of Alaska:

Jennifer A. Currie
Alaska Department of Law
Environmental Section
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501

To Settling Defendants

Tracy Timothy Woo
Chief Financial Officer & General Counsel
Aleut Corporation
4000 Old Seward Hwy, Suite 300
Anchorage, AK 99503
Phone 907.561.4300 Fax 907.563.4328

24

Any Party may, by written notice to other Parties, change its designated notice recipient or notice address provided above. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.    EFFECTIVE DATE

46.    The effective date of this Consent Decree shall be the date of Entry.

## XVII.    RETENTION OF JURISDICTION

47.    The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purpose of effectuating or enforcing compliance with its terms.

## XVIII.    MODIFICATION

48.    Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court. Nothing in this Consent Decree shall be deemed to alter the Court's power to approve, supervise and enforce modifications to this Consent Decree.

49.    The provisions of this Consent Decree are not severable, unless by written agreement by the Parties and approval by this Court.

50.    Economic hardship or changed financial circumstances of the Settling Defendant shall not serve as a basis for modifications of this Consent Decree.

## XIX.    TERMINATION

51.    After Settling Defendant has completed the requirements of Section V (*Restoration Requirements and Trustee Oversight*) of this Decree, and has paid all of the Costs in Section VII (*Payment of Trustee Costs*) and any accrued stipulated penalties as required by this Consent Decree, Settling Defendant may serve upon the United States and the State a Request

for Termination, stating that Settling Defendant has satisfied those requirements, together with all necessary supporting documentation.

52.     Following receipt by the United States and the State of Settling Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Settling Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States and the State agree that the Consent Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

53.     If the United States and the State do not agree that the Consent Decree may be terminated, the Settling Defendant may invoke Dispute Resolution under Section IX of this Consent Decree. However, the Settling Defendant shall not seek Dispute Resolution of any dispute regarding termination, under Section IX, until thirty (30) days after service of its Request for Termination.

## XX.     PUBLIC PARTICIPATION

54.     This Consent Decree shall be lodged with this Court for a period of not less than thirty (30) days to allow the opportunity for public notice and comment. The Plaintiffs reserve the right to withdraw from or withhold their consent to this Consent Decree if the comments from the public regarding this Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Settling Defendant consents to entry of this Consent Decree without further notice.

## XXI.     SIGNATORIES/SERVICE

55.     Each undersigned representative of Settling Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party or Parties he or she represents to this document.

26

56.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

57.     Settling Defendant agrees not to oppose the entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless by the consent of the Parties.

## XXII.     INTEGRATION

58.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied therein.

## XXIII.     APPENDIX

59.     The following Appendix and its requirements are incorporated into this Consent Decree:

(a)     The Adak Helmet Creek Restoration and Monitoring Work Plan

## XXIV.     FINAL JUDGMENT

60.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court, as to the United States, the State of Alaska and the Settling Defendant, in accordance with Rules 54 and 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.


Dated:  September 5, 2013

/s/ H. Russel Holland
UNITED STATES DISTRICT JUDGE
U.S. District Court of Alaska

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the State of Alaska v. Adak Petroleum, LLC.

FOR THE UNITED STATES:

DATED: _07-01-2013_

THOMAS A. MARIANI, JR.
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

DATED: _7/2/13_

KATHERINE A. LOYD
Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the State of Alaska v. Adak Petroleum, LLC.

FOR THE STATE OF ALASKA:

DATED: 6/13/13

JENNIFER A. CURRIE
Assistant Attorney General
Alaska Department of Law
Environmental Section

29

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the State of Alaska v. Adak Petroleum, LLC.

FOR THE SETTLING DEFENDANT:

By: Aleut Enterprise, LLC, its sole member

DATED: 6/11/2013

By: _____
RYUICHI R. TSUKADA
President

DATED: 6/11/2013

By: _____
JAMES M. FLEMING
Operations Manager

Appendix A

# Helmet Creek Restoration & Monitoring Work Plan

## Adak Petroleum Diesel Spill

April 13, 2013 Final

A.   Executive Summary..................................................................................................................2

B.   Restoration Description ..........................................................................................................2

    1.   Debris Cleanup ..............................................................................................................4

    2.   Fish Passage...................................................................................................................5

    3.   Creosote Piling Removal...............................................................................................7

    4.   Floodplain Barrel Removal ...........................................................................................9

    5.   In-Stream Barrel Removal .............................................................................................9

    6.   Upstream Capping of Barrel Culverts.........................................................................10

    7.   Erosion and Sediment Control ....................................................................................11

C.   Monitoring ............................................................................................................................12

D.   Reporting ..............................................................................................................................15

E.   Performance Standards ........................................................................................................16

F.   Maintenance .........................................................................................................................17

## A.    Executive Summary

Diesel fuel spilled into Helmet Creek on Adak Island, Alaska on January 11, 2010 injuring natural resources in the creek and the nearby estuary, intertidal and nearshore marine habitats.  Investigations performed by the Responsible Party (RP) and the federal and state natural resource trustees (Trustees) during October 2010 and September 2011 identified restoration opportunities on Helmet Creek.  The pictures below identify the stretch of Helmet Creek proposed for restoration (see, Figure 1 and Figure 2).

## B.    Restoration Description

Restoration will be performed cooperatively with the RP and Trustees.  The Trustees will be present during implementation of the restoration and will be consulted if changes are made in the methodology. If changes involve in-water work or could adversely affect fish populations, the appropriate permitting agency clearance will be necessary.  Additionally the environment on the island of Adak and in Helmet Creek specifically has been altered significantly and the risk of releasing new contaminants or of encountering unexploded ordinances (UXO) exists.  The RP must illustrate that they have followed through on any island specific safety requirements regarding UXO.  Soil samples in areas that will be newly exposed to the stream by barrel removal will be analyzed prior to restoration work.  Soil samples will be collected using standard methods[1] from within and around the barrels and composited into a single sample at each of the following three work locations:

1)  Barrel Location #1;
2)  Barrel Location #2; and
3)  Barrel Locations #3 and #4 (see Figure 2).

The three composite samples will be analyzed for metals, PAHs and PCBs as outlined in Table 1.  If exceedences of thresholds listed are found in the samples, the contaminated area will be re-evaluated for restoration by the Trustees with an option to retain the current plan for the site, modify the current plan at the site, or come up with an alternative action.   The Trustees and RP will discuss modifications to the work plan, if necessary, with the understanding that any existing actions that are eliminated will be replaced with an action(s) requiring similar effort in time and expense.

If more than trace amounts of oil are observed during restoration, sorbent booms and pads will be utilized to remediate any further damage.  All booms and pads will be collected immediately after the work is completed for appropriate disposal.

---

[1] A separate document entitled *Adak Petroleum Diesel Spill, Helmet Creek Sediment Sampling Plan* has been prepared to describe the specific methods that will be used at each of the tree sites.



**Figure 1: Lower Helmet Creek showing structures**



**Figure 2: Upper Helmet Creek showing structures**

**Table 1:  Contaminant Thresholds**

| Symbol | Contaminant | TEL[1] (ppb) | LEL[1] (ppb) |
|--------|-------------|--------------|--------------|
| As | Arsenic | 5900 | |
| Cd | Cadmium | 596 | |
| Cr | Chromium, total | 37300 | |
| Cu | Copper | 35700 | |
| Pb | Lead | 35000 | |
| Hg | Mercury | 174 | |
| Ni | Nickel | 18000 | |
| | PAHs, total (QM calculated) | | 4000 |
| | PCBs, total (QM calculated) | 34.1 | |
| Zn | Zinc | 123000 | |

[1] TEL – Threshold Effect Level; LEL – Lower Effect Level

## 1.  Debris Cleanup

Roughly 15 to 20 pieces of anthropogenic debris (plywood, scrap metal, etc.) were noted in the creek during the various surveys.  There is some risk that this material could adversely influence habitat quality or potentially shift and cause future fish passage blockages.  Virtually all of the material can be easily removed by hand in a day.  A team of two or more people shall walk the channel from the small boat harbor to the spill origin site -- collecting and hauling away all anthropogenic material located within or immediately adjacent to the creek.  On future monitoring trips, this exercise will be repeated to remove any future accumulations.   A wood stave pipe and timber are located immediately above Culvert #2 (Figure 3).  This wood stave pipe and timber may require mechanical effort to cut away the objects close to both banks.



Figure 3: Wood stave pipe and timber

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 37 of 52

## 2. Fish Passage

### i. *Trash Rack*

Examination of the two trash racks found that neither were tightly fixed to the adjacent concrete headwalls. Hardware historically holding the racks in place appears to have deteriorated over the years. Also, the trash rack at Culvert #2 has partially pulled away from the headwall. Both structures can likely be removed by hand by one or two people after first using a reciprocating saw or hacksaw to detach any remaining fittings.

Trash racks will be removed on the first day of restoration work. Hand tools may be used to remove the sediment around the trash rack to allow its removal. Once the racks are removed, the channel bed in the immediate area shall be disturbed using hand tools to break up any minor sediment steps that may have formed. The two sites will then be left undisturbed for several hours before decisions are made on final channel reconfiguration. This will allow time for a natural hydrologic regime to form in the affected areas.

*Culvert #2*: The downstream end of this culvert looks fine, but the upstream end is blocked by the plugged trash rack. The channel will also need some minor handwork to eliminate the vertical drop into the culvert. Currently there is a 12 to 18-inch drop into culvert #2. In order to eliminate the vertical drop after the trash rack is removed, the accumulation of boulders and other sediment will need to be reconfigured to create a relatively stable streambed with no drops exceeding ten (10) vertical inches. The exact process will be determined in the field during the restoration process in coordination with ADFG and NOAA fisheries biologists and is expected to consist of one or more of the following steps:

- Fill in the drop area of the stream and possibly remove some of the stream bed at the top of the drop.
- To ensure that the resulting grade is not too steep, the restoration could include some hand work to rearrange boulders upstream. Reference-reaches upstream can be used to identify the appropriate slope for the stream following trash rack removal.

*Culvert #3*: The bed of the stream upstream to the next culvert (a distance of approximately 25 feet) may also be modified as necessary to ensure the slope is not a barrier to fish passage. The exact process will be determined in the field in coordination with ADFG and NOAA fisheries biologists and is expected to consist of one or all of the following steps:

- Fill in the drop area of the stream and possibly remove some of the stream bed at the top of the drop (see Figure 4).
- If the channel grade exceeds four percent, create two, or possibly three, equally spaced steps (see Figure 5). The steps should reduce the effective grade for fish passage, help trap sediments, and should not disrupt stream conveyance. All steps will include gaps as necessary to minimize fish jump height.

- Create a step at culvert mouth to help preclude significant head-cutting of the channel upstream.
- Review potential for sluicing of sediment from culvert and take steps to avoid this action as necessary. This may include creating a small step downstream of the culvert equivalent to the existing step downstream of Culvert #4.

Given the existing grade, it is expected that any necessary changes can be made by hand with minimal disturbance.



**Figure 4: Drawing of proposed channel regrade (Typical)**



**Figure 5: Drawing of potential step pool configuration option**

Currently, a step is present before the downstream edge of Culvert #4. The diameter of these rocks ranges from 7 to 18 inches. It is likely that this would also be a suitable diameter for any future steps. Configuration of the rocks in the step will be determined once the trash racks are removed and flows are observed.

### ii. *Spill Control Structures*

Concerns for fish include: (1) the lack of light that the gate lets into the culvert and (2) the possibilities of increases in velocity through the opening during high water in spring. The gates shall be opened to a point where the bottom of the gate is approximately six inches above the water surface at peak flows. The gates are raised and lowered using hand-operated cranks and can be readily moved as the equipment is in good operating condition. The gates may be maintained permanently in that position. During fuel transfer operations the operator may choose to temporarily return the gates to a partially closed position as a safety measure. Partially closing the gates will not interfere with fish passage.

### iii. *Streamwide Issues*

General observations of all culverts and possible fish passage barriers should be performed when restoration is occurring and on future monitoring visits. Specifically, observers should record any clogging of culverts, culvert failures, stream bank collapses, diversions of channel, and debris obstructions.

## 3. Creosote Piling Removal

### i. *Water Quality*

As an issue of water quality, removal of creosote pilings would benefit water quality in Helmet Creek. From initial observation by the Trustees at the site, it seems creosote piles are located near enough to a road that an excavator or heavy truck equipped with a choker can access the site and pull the piles from the streambed. However, the Trustee observer does not have a high level of expertise in this type of removal, so if the piles cannot be removed from the road, a small hole should be excavated with a shovel and the pile cut off below the streambed elevation to remove the piling at streambed level. Any holes left in the streambed shall be filled with clean gravel from a nearby gravel bar.

### ii. *Piling Between Culverts #4 and #5*

A total of three pilings are present between Culverts #4 and #5. One is in Helmet Creek (see Figure 6) and two others are approximately two feet from the bank.

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 40 of 52



**Figure 6:  In-stream Piling**

### iii.  *Piling After Culvert #5, across from iron floc stream*

Three additional pilings exist on the upper bank near the road.  Again, due to close proximity of the road, removal can be conducted with machinery that is road-based.  The piling are above the high-water mark of Helmet Creek, but drainage into the creek would be affected by the creosote coating on the pilings.  Piles that cannot be readily removed from the road will be cut off at ground level and the surface capped with clean soil and native seed or vegetation mat, if available (See Figure 7).



**Figure 7: Upper Bank Pilings**

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 41 of 52

## 4. Floodplain Barrel Removal

The floodplain barrel removal would consist of removing eleven (11) barrels, plus some pieces of barrels located along the shoreline. From the view available through a number of holes in the barrels, they appear to be filled with dirt and rocks. Most of the barrels are located above ordinary high-water and were probably placed as bank protection. These barrels do not seem to be supporting the banks of the stream. In many cases there were hollows behind the barrels and the stream bank. While in some cases the vegetation grows from the bank to the tops of the barrels. If the removal is done carefully, the vegetation mats can be removed and placed in the gap the barrel occupied. All mats at risk of being carried away during peak flow events shall be staked in place using wooden stakes. Many of the barrels are missing and the banks at these locations are stable. In addition, some of the barrels have pulled away from the banks and are tilted towards the river. There is no sign that significant erosion occurred as a result.

A terrace (old building site) immediately adjacent to the barrels on the east side provides a good work staging area. The lower grouping contains three barrels located behind a large boulder on the bank above the creek. Six additional barrels are located in the upper grouping. All six are on the bank above the creek channel. The vegetation plug growing atop each barrel should be removed and set aside. Soil samples should be taken and analyzed prior to restoration from each of the barrels to ensure that new contaminants will not be introduced into the stream. Some of the sediment in the barrel can be emptied at the barrel site to partially fill the hole left by removal of the barrel. A depression should be left into which the vegetation plug is placed such that it is level at the same slope as the adjacent vegetation. Any additional sediment remaining in the barrels after filling the holes should be used to slope the bank behind the barrels. Vegetation mat should be staked in over as much of the exposed area as possible. If the sediment test confirm the fill is clean, sediment will be placed in the depression and covered by vegetation mat. Other scraps of barrels and debris along the creek in this area should be removed. Disturbed areas without vegetation (potentially up to 75 square feet) should be seeded with the *Approved Vegetation Mix*. (See Table 2). The barrels and all other man-made debris should be disposed of offsite.

### Table 2: Approved Vegetation Mix

| Percent | Common Name | Scientific Name |
|---|---|---|
| 60 | 'Norcoast' Bering Hairgrass | *Deschampsia beringensis* |
| 20 | 'Boreal'Red Fescue | *Festuca rubra* |
| 15 | 'Arctared" Red Fescue | *Festuca rubra* |
| 5 | Annual Ryegrass | *Lolium multifloum* |

## 5. In-Stream Barrel Removal

A section of the creek actually flows through barrels like a culvert. The barrels seem to be two-deep and, although the stream flows around the barrels as well as through them, the barrels

constrict the stream movement.  This would be in-water work and disruptive to the stream during implementation, but the restoration work should provide a net benefit for the long-term, allowing natural stream geomorphology and flow.  It also diminishes likelihood of large blowouts in the stream during high water events or spring high flows.  For this removal, barrels should be removed from the stream without disturbing the bank.  In places where the bank has grown over the barrels, the vegetation mat should be cut and the barrel removed.  The area is approximately six (6) barrels long.   Another single barrel acting as a culvert is upstream of the tank farm and should also be removed.  Removal will require in-water work.  The RP or consultant hired to conduct the work will need to obtain a Fish Habitat permit and comply with recommendations from the Alaska Department of Fish and Game (ADF&G) on the correct removal procedure and work window.  This site consists of the remains of several rows of barrels historically used as culverts.   All barrels are still within the active channel, with many of them completely submerged.  Several barrels have a thin veneer of vegetation growing on their sides.  A few of the barrels are also supporting some of the soil along the margins of the channel.

Vegetation from atop the two barrels in the middle of the grouping should be cut loose from the bank, lifted off, and set aside for reuse.   Where the banks are up against the barrels, bank soils should be removed with shovels leaving a stable 45 degree slope down to the water's edge.  Excess soil should be managed according to Fish Habitat permits.   All readily accessible barrels and scrap should be removed from the channel by hand.  This may require passing a cable through the barrel and lifting or pulling.   Minor digging using hand tools is acceptable but no extensive digging in the channel should occur.   Barrels or pieces of barrels that cannot be removed by hand or with hand tools should be left in place.   It is expected that 95 percent or more of the material in the channel can be removed in this way.

One location has a single, partial barrel embedded in the streambank.   Most of the barrel has rusted away, leaving the rim and some of one side to partially support the bank.  The remains of the barrel do not block flow, but may cause blockage in the future.  The rim and any readily accessible portions of the barrel should be removed by hand while minimizing disturbance to the overlying vegetation.  The thick mat of vegetation should be left undisturbed to protect the shoreline.  No revegetation should be necessary.

## 6.  Upstream Capping of Barrel Culverts

This barrel location consists of two culvert/barrel complexes in an "L" configuration which diverts a small percentage of the upstream flow.  (see Figure 8)   The culverts are completely buried, so it is impossible to estimate the exact number of barrels in the ground.   Removal of all barrels would require significant disturbance to the landscape and at least one stream crossing by heavy equipment as needed for access to the work area.   Because benefits to the environment from barrel removal are minimal, we propose to simply plug the most upstream (inlet) barrel with a 2 x 2 foot vegetation plug, which would in turn cut off flow to the remaining downstream barrels.  The barrels shall be left in place under the tundra and allowed to rust away.  The vegetation plug shall be collected from an upland area outside of

the creek channel and fitted to the eroded area of the bank at the culvert inlet such that it blocks flow from entering the culvert mouth. Wood stakes shall be driven through the plug and into the underlying soil to hold the plug in place.



**Figure 8: Sketch of Culvert/Barrel System**

## 7. Erosion and Sediment Control

In addition to the revegetation that is directly a part of the restoration for floodplain barrel removal, the following restoration protocols should be used wherever work performed in the creek or near the shores could lead to erosion, sediment release, or denuded vegetation. The primary method for revegetation at each disturbed area shall be to utilize healthy vegetation mats that are removed from the barrels. If no mats are available in the immediate work area, material shall be collected from within 100-feet of where the plug/mat is to be used, as far as possible from any roads, trails, or streams/wetlands, and in a relatively flat location where future erosion is not expected to occur. Any Trustees in attendance during restoration shall be consulted for final approval of the donor vegetation collection locations. If necessary, the ground shall be seeded afterwards with the *Approved Vegetation Mix.* These mats shall be set aside until cleanup work is complete and then laid over disturbed areas as part of the erosion control process. All mats at risk of being carried away during peak flow events shall be staked in place using wooden stakes. Where mats are not available, the *Approved Vegetation Mix* shall be used. (See, Table 2) The *Approved Vegetation Mix* identified for this project was developed by the Alaska Plant Materials Center for use in reclamation at various upland landfill locations on Adak Island (Alaska 2011 in RP report). The grasses are also recommended by ADF&G for

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 44 of 52

bank protection work near streams (Alaska 2005 in RP report).   Seed for the *Approved Vegetation Mix* shall be sourced if possible from local Alaska-grown seed guaranteed to meet State of Alaska Seed requirements per Title 11 AAC 34.010.   This will help guarantee purity and quality while keeping the percentage of non-native and invasive species to a minimum.  The *Approved Vegetation Mix* is expected to provide temporary site stability during natural re-colonization of native plant species.  Revegetation will also occur at the site of the piling removal, as well as any other area where vegetation is negatively affected due to restoration or monitoring activity.

The seed mix will be applied at a rate of 40 lbs/acre (1 lb/1000 sq.ft.) as recommended by the Alaska Plant Materials Center for the type of sandy soils found adjacent to Helmet Creek (Alaska 2008).  It is estimated that no more than one to two pounds of seed mix will be needed for this project.  No fertilizer shall be applied due to the proximity of the proposed restoration work to the creek channel.

## C.    Monitoring

If restoration implementation occurs in 2013, monitoring should occur in 2013, 2014 (1-year post-implementation), 2015, and 2017.   This monitoring schedule will allow for the following:

- Observations immediately post-implementation to allow for adjustments in stream substrate, step pools, vegetation, or erosion control;
- annual observations of the streambed and slope immediately post-construction and then every monitoring year.
- observation of the stream following two even-year pink salmon classes post-construction;
- observation of  stream flow and  streambed conditions -- to be observed after four years of normal stream conditions;
- observation of  the stream in 2017 -- one year past when ADEC has predicted that the oil would have dissipated naturally.

**Compliance Inspection**:  The objective of compliance inspection shall be to verify that all proposed actions and restoration goals, as described in this plan, have been correctly and fully implemented, and that any changes made in the field are consistent with restoration planning goals.   The compliance inspection survey shall evaluate each work location immediately upon completion of the restoration actions (Year 0) and shall serve as a record of the post-restoration baseline condition.  Field evaluation tasks shall rely primarily on photographs taken by trained personnel.  Trustees and the RP will work cooperatively to ensure that appropriate monitoring is being conducted. Trustees plan on being present all monitoring years. This includes two Trustees for construction monitoring, and one Trustee for each of three subsequent monitoring events (total of five person trips). If during the monitoring, it is determined that an adjustment to the restoration action needs to be taken in order to meet the restoration goals, these actions will be undertaken cooperatively.  If the adjustment(s) require a new permit, this must be obtained prior to resuming restoration work.

1. **Fish Passage:**

   i. *Trash Racks*

   Monitoring will occur for the trash rack removal, streambed regrade, and untouched streambed.  The monitoring will be performed for the stream section directly below, through, and above the culvert.  The reach where monitoring will occur will be calculated at 40x wetted-width, with the center of the reach being the initial restoration activity as encountered travelling upstream from the mouth of Helmet Creek.  This will enable monitoring of changes in stream condition resulting for the trash rack removals that occur outside the immediate work zone.  Due to the short distance between projects in the lower section of the stream, one reach will overlap with the next restoration location.

   *Trash Rack Removal Procedures*:

   Monitor the downstream and upstream impacts of trash rack removal on physical parameters of stream and floodplain.  Physical parameters of importance will include anything that could obstruct the upstream movement of adult pink salmon.  This would include identification of any new obstructions or blockages to fish movement such as exaggerated width to depth ratios (very shallow reaches), culvert blockages, or new vertical drops greater than 10 inches.  Monitoring frequency should be every monitoring year, preferably in the same season each year.  The reach should be calculated at 40x wetted-width.  Due to the short distance between projects in the lower section of the stream, one reach will overlap with the next restoration location. Conduct photo point and visual assessment of stream bed and stream bank integrity at removal sites.

   ii. *Streambed Regrading Following Trash Rack Removal*

   - Normally, a natural reference reach would be used to determine the appropriate slope, but it is doubtful that the stream is located in the historic channel, and therefore a suitable reference reach has not been identified.  Instead, the regrade will aim to eliminate fish passage obstructions -- based on jump heights referenced to the literature on what is acceptable for pink salmon fish passage.  These determinations will be presented to the Trustees for approval prior to implementation.  Initial monitoring will measure the grade upstream and downstream of the culvert to ensure that the slope does not inhibit fish passage.  The monitoring distance upstream or downstream should overlap the undisturbed streambed by a few feet.  It is likely that the regrade footprint will be restricted by the presence of the next culvert.  For these, the grade will be monitored from culvert to culvert to ensure proper passage.  The grade will be monitored every monitoring year to ensure that changes as the stream adapts do not decrease passibility.  Monitor physical parameters of stream and floodplain.  Monitoring frequency should be every sampling year, preferably in the same season each year.
   - Conduct transect measurement of in-stream parameters, such as stream width, depth, and grade.  Monitoring frequency for this assessment should be every monitoring year.

- Conduct photo point and visual assessment of stream bed and stream bank integrity looking downstream and upstream over regarded area.  Monitoring frequency for this assessment should be every monitoring year.

### iii.  *Spill Control Structures*

- Gate positions shall be visually inspected to ensure the bottom of the gate is placed and maintained roughly six inches above the average water-surface elevation.  Photo verification should be taken.

## 2.  Creosote Piling Removal

- Conduct photo point and visual assessment at removal location.  If piling is in- stream, assessment of stream bank before and after removal will be conducted to evaluate whether any bank erosion or degradation has occurred.  Monitoring frequency for this assessment should be every monitoring year.
- Vegetation growth and composition will be assessed at each piling removal site located outside of the stream channel.  Monitoring frequency for this assessment should be every monitoring year.  Data collection will identify density of plant growth in terms of percent coverage and identification by species.  These data will be compared to data collected on control sections of an undisturbed section of stream bank.

## 3.  Floodplain Barrel Removal

- Conduct photo point and visual assessment of stream bed and stream bank integrity looking downstream and upstream over area of removal.  Monitoring frequency for this assessment should be every monitoring year.  Vegetation monitoring for this area is covered in section 6v.

## 4.  In-Stream Barrel Removal

- Conduct transect measurements of in-stream parameters such as stream width, depth, and grade.
- Monitor physical parameters of stream and floodplain.  Monitoring frequency should be all monitoring years, preferably in the same season each year.
- Conduct measurements of water depth and channel width in removal areas and reference reaches.
- Conduct photo point and visual assessment of stream bed and stream bank integrity looking downstream and upstream over area of removal.  Monitoring frequency for this assessment should be every monitoring year.

**5. Capping of Upstream Culvert Barrel Complex**

Conduct photo point and visual assessment of stream bed and stream bank integrity looking downstream and upstream over area of bank plugs. Monitoring frequency for this assessment should be every monitoring year.

**6. Erosion /Revegetation**

Conduct data collection as previously mentioned in above sections, but data collected needs to also address the following erosion and revegetation monitoring parameters in order to address later stated performance measures.

*i. Trash Rack Removal Areas*

Conduct visual inspection of the channel for signs of erosion, including a photo point taken every monitoring year.

*ii. Streambank Barrel Removal*

- Conduct photo-quadrat and visual assessment of stream bed and stream bank integrity -- looking downstream and upstream over area of removal. Monitoring frequency for this assessment should be every monitoring year.
- Assess vegetation growth and composition at removal sites. Monitoring frequency for this assessment should be performed every monitoring visit. Data collection will identify density of plant growth in terms of percent coverage.

*iii. In-Stream Barrel Removal*

- Assess vegetation growth and density at removal site. Monitoring frequency for this assessment should be performed every monitoring visit.

*iv. Piling Removal*

- Assess vegetation growth and density at site. Monitoring frequency for this assessment should be performed every monitoring visit.

*v. Areas Affected by Restoration or Monitoring Activity*

- Assess vegetation growth and density at site. Monitoring frequency for this assessment should be performed every monitoring visit.

## D.    Reporting

Four reports shall be prepared -- including a compliance inspection report -- after substantial completion of the restoration work in 2013. The compliance inspection report should include the data from any pre-construction monitoring, such as the culvert capping activity. Three additional monitoring reports will be submitted in 2014, 2015, and 2017.

# E.    Performance Standards

If there is a need to adjust the restoration action in order to meet performance measures, this will be done cooperatively with Trustees and the RP. In these cases, monitoring may be reset to allow for a full three post-work monitoring visits.

## 1. *Fish Passage*

Upstream fish migration access shall be considered unblocked if the following conditions are met:

- No accumulation of debris that blocks greater than 10 percent of the opening (upstream or downstream) or interior of any culvert or spill control gate.

- No accumulation of debris at either opening or in the interior of any culvert that creates a vertical drop in-water surface elevation of greater than four inches.

- No changes in streambed configuration between Culverts #3 and #4 or at in-stream barrel removal locations that result in a significant increase in the slope of the stream, or the creation of jump heights in excess of 10-inches which can be barriers for the passage of weak swimming fish species. Jump heights shall be measured as shown in Figure 9. The measured height shall be the minimum jump height that must be overcome by a fish moving upstream as determined by a trained fisheries biologist. The biologist shall identify the likely preferred passage location taking into account such factors as gaps in the step, suitability of launch and landing locations, and any other obstructions that could interfere with passage conditions.

- The spill control gates are maintained in a position no less than six inches above the peak water surface elevation.

- Following removal of the barrels, in-stream hydrology of the creek must still allow for fish passage. Measurements of water depth and channel width should ensure that the stream does not go subsurface, and these measurements should be comparable to reference reaches.



**Figure 9.  Technique for measuring jump height.**

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 49 of 52

### 2. *Erosion/ Revegetation*

This Section considers measurements for areas where vegetation was disturbed in the restoration process. Restoration shall be considered stable if the following conditions are met in locations where revegetation is used:

- Year 2014 -- One year following completion of revegetation — There is no more than minor erosion in or directly adjacent to locations where barrels were removed after bank settles. There is no erosion where equipment was located.
- Year 2015 and 2017 — There is no more than minor erosion of areas where equipment was located or directly adjacent to locations where barrels were removed.
- Revegetation will be assessed as percent cover of native vegetation over the disturbed areas for seeded areas, and transplanted vegetation mats. Revegetation and these performance standards will occur in barrel removal areas, piling removal areas, and areas where vegetation has been harmed in the restoration process.
- Percent Cover (seeded areas):
   2014 – greater than 50%
   2015 – greater than 75%
   2017 – greater than 95%
- Percent Cover for Vegetation Mats:
   Year 2013 – minimum of 95% coverage of mat with live vegetation.
   Year 2014, 2015, 2017 – greater than 95% coverage of mat with live vegetation.
- Native species dominance: Disruption of an area can lead to an increase in non-native species. Areas revegetated should be dominated by native species with non-natives not exceeding 5% of the total plot.

### 3. *Cap of Upstream Barrels*

Observations of the water diversion and investigations of the diverted flow should occur every monitoring year to ensure the capping action did not have unexpected repercussions. The culvert vegetation plugs will be examined for presence, stability, and effectiveness.

## F.   Maintenance

### 1. *Fish Access*

- No accumulation of debris that blocks greater than ten percent of the mouth or interior of any culvert or spill control gate. If debris accumulation occurs, it shall be removed by hand and disposed of offsite.
- No accumulation of debris at the opening or in the interior of any culvert that creates a vertical drop in water surface elevation of greater than four inches. If debris accumulation occurs, it shall be removed by hand and disposed of off-site.
- No changes in streambed configuration between Culverts #3 and #4 that result in a change in the slope of the stream or jump heights in excess of 10-inches, which can be barriers for the passage of weak swimming fish species. If streambed configuration changes and becomes a barrier to fish passage, corrective actions must be implemented and approved by a representative Trustee on site.

- The spill control gates should always be situated no less than six-inches above the average water surface elevation, except for periodic and temporary partial/full closure during fuel transfer operations.  If the gates are not higher than six inches from the water's surface, except during the aforementioned exception periods, the gates must be adjusted to achieve the performance standard.  Measurements must be made on monitoring visits and adjustments implemented as necessary.
- Throughout the stream, fish passage should be adequate for passage of weak swimming fish.  If any unforeseen event creates a blockage, action should be taken to restore fish passage in agreement with a Trustee representative.

## 2.  *Erosion/Vegetation*

- Areas in or directly adjacent to locations where barrels were removed that do not meet erosion performance standards shall be further stabilized by covering the affected area with a biodegradable landscaping fabric and reseeding with the approved vegetation mix.  (See Table 2)  Seeded areas that do not meet percent-coverage standards shall be treated as follows:

  I.   After completion of work in 2013 – the area shall be reseeded with the approved mix. The Alaska Plant Materials Center shall be contacted for advice on selecting a more appropriate seed mix.

  II.  In years following construction (2014, 2015 and 2017) – photos and measurements shall be collected at the site and for evaluation.

- Areas where mats were used that do not meet percent-cover standards shall be treated as follows:

  After completion of work in 2013 and in all monitoring years:

  I.   If the vegetation within the mat covers greater than or equal to 95 percent, a photo of the mat shall be taken and the mat shall be left alone.

  II.  If the vegetation within the mat covers less than 95 percent, but more than 50 percent, the approved vegetation seed mix will be applied to the sparsely vegetated areas of the mat.

  III. If the vegetation within the mat covers less than 50 percent, the mat shall be removed and the area shall be seeded with the approved vegetation mix.

  IV.  In areas that exceed the 5% tolerance limit for non-native vegetation, the situation will be evaluated to determine the best method of correction.  One possible method could be to remove the non-native vegetation by hand and reseed the area with the approved seed mix.

## 3.  *Removal of In-Stream Barrels*

If restoration activities result in a significant change to the creek channel that blocks fish passage, action will be taken to modify the restoration in accordance with the Performance Standards.  If in-water work is required, Trustees must approve new restoration actions, and all applicable permits must be secured prior to conducting work.

### 4. *Cap of Up-Stream Barrels*

If significant dewatering of the main stem or channel migration is observed, action will be taken to modify the restoration.  If in-water work is required, Trustees must approve new restoration actions, and all applicable permits must be secured prior to conducting work.

If culvert vegetation plugs are missing, loose, or damaged (e.g. leaking), action will be taken to modify or replace defective plugs as necessary to meet the goal of preventing stream flow from entering the culverts.  This might include replacement of the plugs, addition of sand bags inside the culvert to back up the plugs, or addition of more staking.  If future failure looks imminent, the culvert can be crushed in the immediate area, and the disturbed area vegetated with soil plugs or seed as necessary to protect the site from erosion.  This decision shall be made in conjunction with NOAA and/or ADFG staff.

Case 3:13-cv-00121-HRH   Document 6   Filed 09/05/13   Page 52 of 52